## Dickey's Appeal.   Cresson's Appeal.

1. A testator devised lands in trust for a charity; and made a residuary devise. The residuary devisees and heirs at law commenced proceedings to have the devise declared void, and agreed as a family arrangement to avoid dispute amongst themselves, that in case of success it should be treated as intestate property. The court below decided the devise good, an appeal was taken under the same agreement; the husband of one of the heirs having means, (the others being poor), agreed to pay the expenses, &c., to be taken out of the land and the balance to be divided between his wife and the other heirs. *Held*, that these facts constituted a sufficient consideration for his agreement.

2. This agreement constituted the wife a tenant in common in equity with the other heirs in the title if any to the lands; and the husband was bound to proceed with the appeal until released by all the parties.

3. Any purchase of the lands made by the husband on behalf of his wife would enure to the benefit of the other heirs.

4. The appeal pending, the husband purchased the lands from the trustees in the devise and sold them at an advance. *Held*, that he was trustee for the heirs and must account for the profits.

5. The husband sold the lands and some of his own adjoining of greater value for an aggregate sum. *Held*, that he was entitled to be credited in his account with the excess of value of his own lands.

February 26th and 27th 1873.   Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Appeal from the decree at Nisi Prius: No. 35, to January Term 1868.   In Equity.

The bill was filed January 3d 1868, by John Elliott Cresson, Clement Cresson, Ezra T. Cresson, James W. McAllister and Annabella his wife, late Cresson in her right, Alexander Porter and Emma his wife, late Cresson in her right, Ezra T. Cresson, executor, &c., of Jacob Cresson, deceased; said John Elliott, Clement, Ezra T., Annabella, Emma and Jacob, being children and heirs at law of Warder Cresson, deceased, against John M. Dickey and Sarah E. his wife, late Cresson in her right, and David Carscaddon.

The bill was for an account of the proceeds of certain lands in Clinton county, Pennsylvania, devised by Elliott Cresson, to trustees for a charitable use, purchased from them by John M. Dickey, D. D., one of the defendants, and afterward sold by him; the plaintiff in the bill alleged that the lands had been purchased and sold by Dr. Dickey as trustee for them and his wife, they being the heirs at law of Elliott Cresson.

The will of Elliott Cresson was dated September 3d 1853; there was a codicil dated October 7th 1853, both were proved February 27th 1854.

The clauses of the will and codicil which are at all involved in the questions of this case are as follows:—

" * * * Item.   I give and bequeath to my friends Joseph R. Ingersoll, Eli K. Price, John W. Claghorn, E. F. Rivinus, Freder-

ick Fraley, William Parker Foulke, Thomas S. Mitchell, Dr. Kirkbride, Joseph Harrison, and my executors hereinafter named, my lands in Clinton county, Pennsylvania, or the proceeds thereof if sold during my lifetime, in trust, for the foundation and support of a home for aged, infirm or invalid gentlemen and merchants, where they may enjoy the comforts of an asylum, not eleemosynary, but as far as may be, by the addition of their own means, and by reference to the Prytaneum of ancient Athens, an honorable home; with the hope that it may be perpetual and enlarged by the bequests of its grateful inmates, until it shall become worthy of the city of Penn, and a blessing to a class whose wants have hitherto been overlooked, leaving to my said trustees full power to conduct and carry out this institution on the best possible plan, and to provide for its permanent usefulness, in or near my native city.

    *         *         *         *

Item.   I give and bequeath to my said executors, the sum of twenty-five thousand dollars in trust, the income whereof I direct to be paid to my beloved sister Elizabeth T. Cresson during the term of her natural life and at her death to be equally divided among her children, Jacob, John Elliott, Clement, Ezra and Annabella Cresson.

Item.   I give and bequeath to the three sons of my sister Sarah, viz.: Ebenezer, Cresson and Clement Dickey, my reversionary interest in the estate of my beloved brother Clement. * *

Item.   Aware that the foregoing bequests may not be phrased in due form, I request that they be nevertheless carried out in accordance with their obvious intent and meaning; and that in no event shall any portion of my estate, personal or mixed, fall into the hands of Warder Cresson.   To my beloved sisters Annabella and Sarah I leave such articles of personal chattels or furniture as they may select; and finally revoking all former wills, I hereby declare this to be my will, and constitute and appoint Jacob Cresson, George V. Bacon and William Coppinger as my executors to the same.

By the codicil:    *    *    *

"Finally: If any residue remains after the payment of the aforesaid legacies, I give the same in equal proportions to the forenamed children of Warder Cresson; but in no event shall any portion of my estate be diverted from the object designated, for the benefit of said Warder Cresson."

To the October Sessions 1856, of the United States Circuit Court of the Eastern District of Pennsylvania, John E. Cresson (one of the plaintiffs in this bill and a child of Warder Cresson) filed a bill against the surviving executors of Elliott Cresson, the trustees under his will, Jacob Cresson, Clement Cresson, Ezra T. Cresson and Annabella Cresson, children of Warder Cresson, Mary Cresson, Warder Cresson, and John M. Dickey and Sarah

E. his wife in her right.    The object of the bill was that the court might declare the trust of the Clinton county lands void, that those lands were part of the residuary estate of Elliott Cresson and passed to the five children of Warder Cresson, named in the will as residuary legatees; and that one-fifth of them and of the rents, &c., belonged to the plaintiff in that bill.

St. G. T. Campbell was solicitor of the plaintiff in the bill.

The defendants demurred or answered to the bill.

John M. Dickey and wife answered that the devise of the Clinton county lands was inoperative, and that as to those lands Elliott Cresson the testator died intestate; that the lands, therefore, descended to his heirs at law and did not become part of his residuary estate; that Elliott Cresson left surviving him, as his heirs at law, Mary Cresson his mother, Warder Cresson, a brother, Annabella Cresson and Sarah E. Dickey, sisters; that Annabella Cresson afterwards died, directing by her will, that the share of her property which would have been Warder's should go to his wife, E. T. Cresson; the respondents, Dickey and wife, further averred in their answer, that one third of the Clinton county lands passed to Sarah E. Dickey as one of the testator's heirs at law, subject to the life estate of his mother, Mary Cresson.

On the 5th of October 1857, the Circuit Court of the United States dismissed the bill.

Warder Cresson died in November 1861.

The bill in this case set out the foregoing facts and averred, that the proceedings in the Circuit Court had been instituted on behalf of the residuary legatees of Elliott Cresson and with the " consent and agreement " of Emma Porter, one of these plaintiffs, and a child of Warder Cresson, and with consent of John M. Dickey and wife.

The plaintiff further averred that shortly after the dismissal of the bill in the Circuit Court of the United States, he removed to Texas, and John M. Dickey proposed to him that an appeal should be taken from the decree of the Circuit Court, to the Supreme Court of the United States, and agreed to enter bail, pay the costs, &c., on condition that if the decree should be reversed, Mrs. Dickey should have one half of the land or their proceeds if sold, and all the children of Warder Cresson, the other half.    On these conditions the appeal was entered and agreed to be prosecuted by John M. Dickey.

That in the spring of 1860, John M. Dickey proposed to the trustees holding the Clinton county lands, that the suit in the Circuit Court should be compromised, and he purchase the land for $15,000, and that the compromise and purchase were to be mainly for the benefit of the children of Warder Cresson; in consequence of these representations, the trustees agreed to convey their title to John M. Dickey for a sum far below their value and less than they would have sold them to any other person, and that

the sale was in compromise of the suit and of a doubtful right and for the benefit of all the claimants, but especially for the benefit of Warder's children, in trust as to one half for them, and as to the other half for Mrs. Dickey; that on May 18th 1860, Dickey wrote to John E. Cresson, informing him of the compromise and purchase, and saying that he expected to sign a paper to be left with Cresson's mother as representing her children, binding himself to give them "the half of the net proceeds from the property * * * after paying the purchase-money, interest and expenses of every kind;" that about the same time the trustees conveyed the land to Dickey, who afterwards said "that he had executed a paper which he would deliver to the mother of the plaintiff, stating that he held one-half of the lands in trust" for the plaintiff, "and in case of his decease it would appear how he held the lands."

That after the conveyance, Dickey took possession of the lands, and as they were distant, employed David Carscaddon, he to act as agent for all the owners of the lands and be paid out of their profits. That Dickey held the title of the lands in trust for his wife and the plaintiffs, to sell them and pay from their proceeds the necessary expenses, and the profits to be divided between Mrs. Dickey, Carscaddon and the plaintiffs. That Dickey and Carscaddon made large profits in using and selling the lumber from the lands, and from rents, improved lands and mills on them.

That in 1865, Dickey sold the lands, and $10,000 were paid on account of the purchase-money, which were forfeited by reason of failure by the purchaser to pay the residue; that about November 14th 1866, Dickey sold the lands to Ario Pardee for $100,000, thereby realizing a profit of $85,000.

The prayers were for an account of the timber, &c., sold for rents, and all moneys received in any manner by Dickey and Carscaddon; for a decree that Dickey pay to the plaintiffs their share of the forfeited $10,000, and of the proceeds of the sale to Pardee, and for general relief.

Dickey answered; admitting that the suit was instituted in the Circuit Court for the purpose alleged in the bill, with the approval of all the parties; there was no formal agreement, but a general understanding in the family that the suit should be prosecuted for the benefit of Mrs. Dickey and Warder Cresson's children. He averred that the decision of the court was so emphatic that the plaintiff and himself abandoned all claim to the lands and the prosecution of the suit; that after nearly two years, of his own motion, he proposed to the plaintiff in that suit, that with his permission he (Dickey) would take an appeal to the Supreme Court of the United States, but there was no such agreement as to the terms upon which bail was to be entered and expenses paid, as mentioned in this bill; that after the appeal he made efforts to compromise with the trustees; they declined to compromise, and no compro-

mise was ever made; after consultation with his counsel he came
to the conclusion that success in the appeal was hopeless, and as
he had, of his own motion, suggested the appeal, he in like manner
abandoned it; that several months afterwards he proposed to the
trustees to buy the lands; they had failed to sell the lands; had
incurred a large debt to save them from sale for taxes, and in
defending the suit; Dickey thought by individual attention and
developing the lands he might make a good speculation, and there-
fore approached the trustees as an independent purchaser; he
never proposed to compromise the suit; neither the suit, nor the
claim of his wife or of the plaintiffs was an element in the pur-
chase; he denied that the compromise and purchase were mainly
on account of Warder's children, or that they were to derive the
benefit and profits from the lands when they should be sold.  He
and the trustees had selected two competent persons to examine
the lands and fix their value; they reported $15,000 as a fair
value, and he agreed to pay that sum for them, but not by way of
compromise of the suit; the trustees did not sell for a sum below
their value, or at a price lower than they would have sold to any
other person.  He completed the purchase in May 1860; " paid
in cash about $5000, and gave a mortgage for $10,000 without
any personal bond, so little faith had he in the real value of the
land; that his intention was, and so he declared to the trustees in
his negotiations for the purchase, and repeatedly to the plaintiffs,
or some of them, to embark in the purchase for the benefit of
his wife and the plaintiffs, children of Warder Cresson—and
at one time he proposed giving them a formal agreement to that
effect; but when he found they were utterly unable to assist
him, pecuniarily or otherwise, in the management of the lands,
he was unwilling to place himself under any legal or equi-
table obligation to them, and declined to do so, and so re-
peatedly told them; but still he assured them that he would
do as he had proposed to do, viz.: *give* them a share in the net
proceeds, *not as a matter of right,* but only as a matter of family
affection; and that for these promises and declared purposes there
never was the slightest consideration; they were purely voluntary
offers of his own."  He agreed to give Carscaddon, whom he ap-
pointed to take care of the lands, one-third of them when sold,
but Carscaddon was in no sense the agent of the plaintiff.  The
lands were a heavy burden to him; he had to advance and borrow
large sums of money to meet demands on him from them; and
the plaintiffs did not contribute or offer to contribute anything to
aid him; within four or five years of the purchase he offered to
several persons to share the speculation with him upon payment
of a proportionate part of the outlay, and to one to sell the
whole title on these terms; his offers were declined.  The com-
pletion of the Philadelphia and Erie Railroad to the lands, the

close of the war, and the change in the whole circumstances of the country, afterwards gave increased value to the lands. A large part of the forfeited $10,000 was applied to improvement of the lands; large gains were not made from timber, &c., on them, but loss was sustained, except so far as the proceeds were applied to their improvement. He sold to Pardee in the fall of 1866 for $100,000, but did not realize the purchase-money until November 1867, and "then in fulfilment of his promise he offered to give the plaintiffs what he esteemed to be a full proportion of the net proceeds, which they declined to accept." He offered to permit them to examine the accounts of his agent; he rendered them no formal account; but he denied that he rendered them no account.

Carscaddon in his answer denied knowledge of any of the plaintiffs; that he ever had any business transactions with any of them, and that he ever was their agent.

A general replication was filed and Samuel Robb, Esq., was appointed examiner. He took a large amount of testimony; he was afterwards appointed master. By his report he found the facts in the case so fully that it will not be necessary to refer otherwise to the testimony. He found the will and codicil of Elliott Cresson and their probate; that he left the heirs at law, as before stated; and that Annabella Cresson, the sister, afterwards died, leaving a will, that letters testamentary were granted to the executors named in the will. He also found that the testator had left other legacies, amounting to about $138,000, to personal friends and for charitable purposes. The surviving relatives of the testator being dissatisfied with his will, instituted proceedings to have the trust of the Clinton county lands declared void, in the manner and with the result before stated. During the progress of that proceeding, the parties considered and discussed the question how the lands would pass, should the trust be declared void; whether to the residuary legatees or the testator's heirs at law as intestate estate. An amicable adjustment on this subject was made, and it was agreed that Mrs. Dickey as only surviving sister of the testator should take one half, and the children of Warder Cresson the other half, should the trust be declared void, and in pursuance of this family arrangement, the proceeding had been instituted in the Circuit Court of the United States.

The report then proceeds:—

"It would seem that the trustees, in their endeavors to carry out the trust, met with difficulties, and were embarrassed by want of funds to pay taxes and expenses (the testator not having made any provision therefor), and as the validity of the will was questioned, they could not sell a portion of the lands for this purpose, but were obliged to raise money on their individual notes and by mortgage.

"Meanwhile, in 1858, the trustees leased to parties, named

Myers & Quiggle, the timber-leave of several tracts of the said lands.

"On August 10th 1859, Dr. Dickey wrote to John E. Cresson (who, with his brothers Jacob, Clement and Ezra, had moved to Texas), as follows: 'On making inquiry in Philadelphia, I learned from Mr. Campbell, your attorney in the suit in reference to the Clinton county lands, that there was no movement on your part to continue it, and that it would not be taken further without the payment of previous costs and present fees. The time is passing beyond which it will not be possible to appeal, and as some of the trustees have no confidence in the ability to carry out the will in reference to them in a way to do much good—and this I think is a true and just opinion—I have assumed to pay the necessary charges, and given a fee to Mr. Campbell, and he engages to take an appeal to the Supreme Court of the United States. It may not amount to anything, but in that case you will not have any costs; but if it does, it will be proper to tax you and the rest of the family with their share. The arrangement your Aunt Sarah and I agreed to with the attorney was to unite the claim of her as the legal heir, with all the children of brother Warder as residuary legatee (he being cut off by the will), and as a just arrangement to make it without a trial of ownership afterward. This was done, as I suppose you know, in the previous trial, and I suppose it is best in this. If they sell the lands for the taxes, as it is to be apprehended will be the result, I will hold myself liable to you if you authorize me to buy them for the heirs (and I can raise the money), to the same division of them as if awarded by suit. Mr. Coppinger will send you in a few days a power of attorney from Mr. Campbell, authorizing him to appeal for you, which please sign before a *United States Commissioner* and return *as soon as* possible.' * * *

"On September 1st 1859, John E. Cresson replied as follows: 'Your favor, August 10th, is received. The proposition you made with regard to the Clinton county lands will be satisfactory to me. I have also consulted with my brothers Clement and Ezra, and they are all willing that you should proceed in the matter as proposed by you. As Jacob is absent in the mountains, and will not return for some weeks, and as he desired me to act for him in any matter of importance that might occur during his absence, I can, I think, with safety act for him; were he present I know he would cheerfully give his assent. He will, I hope, return in season to execute his part of the power of attorney. With regard to the payment of the taxes on the lands, we will not be able to meet our share if soon required. However, as Ezra will return to Philadelphia, he may, possibly, with your aid, raise sufficient for that purpose. He will see you and advise with you. As soon as the power of attorney you speak of comes to hand, we will

have it executed *as soon as possible*, and forward to your address. Ezra will be in Philadelphia in time to advise with you and to act for us in the matter. I trust that we may be successful in the undertaking; as it would be very unpleasant to us all to have a trial with Aunt Sarah for the ownership of these lands, it is with pleasure we accede to the plan you propose. * * *

"Accordingly, on October 22d 1859, a petition for appeal was presented, and appeal was allowed, and on November 3d 1859, bail was entered.

"In March 1860, Clement Cresson, for himself, and as attorney in fact for his brothers (John E., Ezra T., and Jacob B. Cresson), and John M. Dickey and J. W. McAllister, gave bond and instituted proceedings in replevin in the Court of Common Pleas of Clinton county, against Myers & Quiggle (known by them to be the trustees' lessees), for six thousand white pine saw logs, of the value of $8000, cut from the lands in question.

"The title of the trustees thus doubly contested, and the appeal to the Supreme Court thus threatening to increase their expenses, and this suit in replevin thus threatening to diminish, if not entirely suspend their only apparent present available resources, Dr. Dickey representing himself to be and understood to be acting in behalf of the heirs at law and residuary legatees, and expressing his desire to help (as he called them) the "more than fatherless children" of Warder Cresson, made a general proposition to the trustees for the purchase of these lands, and, after some negotiation between them, it was finally agreed that two gentlemen, Mr. Philip M. Price and Mr. Daniel A. Stone (one selected by Dr. Dickey and the other by the trustees), should make an appraisement or estimate of the value of the lands.

"On April 6th 1860, the said appraisers made a report in writing, wherein, after reciting the purpose of their appointment, viz.: 'to designate a price which in their opinion would be advisable for the trustees under the will of Elliott Cresson, deceased, to dispose of their interest in about 33,000 acres of land in Clinton county to parties representing the legal heirs of the said Elliott Cresson,' they state that they 'unite in the opinion that a fair valuation of the said lands, under all the circumstances, would be the sum of $15,000.'

"On the same day, Dr. Dickey addressed the following letter 'to Eli K. Price, Esq., chairman of the trustees under the will of Elliott Cresson, deceased.'

"Dear Sir:

"The undersigned having received notice that Messrs. P. M. Price and Daniel A. Stone, who were requested to value the Clinton county lands of the deceased, had set upon them the sum of $15,000, desires to say that he is willing to pay that amount on

23 P. F. SMITH—15

[Dickey's Appeal.]

behalf of the heirs at law of Mr. Cresson, provided the terms of payment are made such as to counterbalance, in some respect, what he considers the full value of the land sold under any circumstances, and provided also the money due for the logs lately cut from the property and only partially removed, may be used in part payment.   The undersigned will agree to pay $5000 in four equal payments: the first when receiving the deed, the second at three, the third at six, and the fourth at nine months—the notes bearing interest from date and with approved security—and to give a mortgage for the balance payable in ten years, embracing a proviso that if the interest shall remain unpaid for more than six months after it has become due, or the taxes more than one year, the amount of the mortgage itself shall be due; the trustees to give to the undersigned their title, with the approval of the court, and all mortgages, taxes, collateral inheritance, and state claims for patent paid, or the undersigned will agree to pay all the claims against the property, as specified by the trustees and by such arrangement as he can make with the parties, giving a mortgage for the balance as above, taking their title with the approval of the court.   Very respectfully submitted, by

                               JOHN M. DICKEY,

        For Sarah E. Cresson, his wife, and residuary legatees
            mentioned in the will of Elliott Cresson."

" On April 14th 1860, the offer of purchase by Dr. Dickey, substantially as made, having been accepted by the trustees, the latter presented their petition to the Court of Common Pleas for the City and County of Philadelphia, wherein, after reciting and representing, *inter alia*, the clause in the will of Elliott Cresson, and ' that they have endeavored for several years past to sell said lands, which are wholly wild, uncultivated, and mountain lands, and have found no purchaser except the husband of one of the heirs of Elliott Cresson, namely, John M. Dickey, who is willing to pay $15,000 for the same—$10,000 to be secured upon the premises and payable out of the proceeds of lands and timber— which price, competent persons, after careful inquiry, have fixed upon as a fair one, under the circumstances,' * * * * * they pray the said court to approve of said sale; and the court granted the prayer of the said petitioners accordingly.

" On May 4th 1860, John E. Cresson (having been advised, as it would appear, of the progress made in the matter of the purchase), wrote to Dr. Dickey for information.   This letter could not be found and was not produced, but it may reasonably be inferred from the contents of Dr. Dickey's reply (presently to be noticed), that the writer either assumed that one of his brothers, as the representative of the Cresson branch of the family, would, or suggested that he should be included as a grantee in the deed from

the trustees; and further assuming that the lands were to belong to the family, he inquired what Dr. Dickey meant by taking in a third party as (it would seem) he had been informed had been done.

"On May 18th 1860, Dr. Dickey replied: 'Yours of 4th inst. I have just received from your brother Clement, and sit down to give you the information you wish in relation to the Clinton county lands. I suppose the deed will be signed by the trustees to-day. I left $2800 with Mr. Junkin yesterday, with the promise of $2200 in a short time in cash, making $5000 in cash and a mortgage for $10,000 more, for which I am bound, as the best possible terms I could get, after a long negotiation and much trouble from the trustees; your lawyer, Mr. Campbell, as well as my own, told me to make any compromise I could with the trustees, as there was everything to fear, if we went to the Supreme Court, that it would result as the former did, against us; and as the last suit was revived by myself, and I must have necessarily borne all the expense of it, I could not with such advice do anything but what has been done. The title I took without having your brother associated in it, because the person furnishing the money to purchase, and running the risk, must necessarily have the property in his right as security; and, again, your brother cannot give you such security in a contract to the proper execution of his part as one having other property can do, so that the danger is only to myself. I expect to sign a paper to be left with your mother, as representing her children, so soon as I get the deeds recorded, binding myself and heirs to give your brothers and sisters the one-half of all the net proceeds from the property, and your Aunt Sarah for our children the other half after paying purchase-money, interest and expenses of every kind, which must first come out of all sales of lands and timber.' He then goes on to describe the lands and to show how unfit they are for farming purposes, and says: 'After getting first cost out of them, I shall be entirely satisfied to divide the balance among us and to aid you in getting the most likely part to be cultivated out of them. I do not now wish to keep any part of the land. I have taken in no third party, as you seem to have been informed, nor do I expect to, though, as the best means of realizing most from them, I expect to give thirty-three per centum to a first-rate land agent .... We may get from $20,000 to $50,000 out of them, but it cannot be told yet, nor is it time until the purchase-money is paid to talk of dividing the profits. This is, I think, as far as I can as yet carry it out, my original proposition. I have had no little trouble and risk as well as outlay of of capital, and as I am no land agent, and would for myself appoint one in Clinton county, in doing it I think I am doing the best for you; our interests in the matter are the same. I will deposit with

your mother also (from which your brother may send you a copy), a copy of the deeds, mortgages and other papers.'

" On the next day, May 19th 1860, the purchase was completed thus : Dr. Dickey and wife, by indenture dated May 16th, for the consideration of $1, granted and conveyed unto the said trustees in fee all land in Clinton county, Pennsylvania, whereof the late Elliott Cresson died seised, and which by his will he devised to trustees, together with all and singular the timber, logs, &c., ' and all the estate, right, title, &c., whatsoever of them the said John M. Dickey and wife or either of them, to have and to hold the said lands, &c., in trust nevertheless to grant the same by sufficient assurances unto the said John M. Dickey in fee." And the said trustees by indenture dated May 17th, for the consideration of $15,000 ($5000 cash and $10,000 mortgage), granted and conveyed unto the said John M. Dickey, in fee, all the lands, &c., which, by the above-recited clause in the last will and testament of said Elliott Cresson were given and devised to the said trustees as aforesaid, and all the estate, rights and interests to or in the same whatsoever, which the said John M. Dickey and Sarah E., his wife, by deed, &c., granted and conveyed unto the said trustees. And on the same day John M. Dickey executed to the said trustees a mortgage of the said lands for $10,000, stipulating for payment of taxes, interest semi-annually, and the principal sum by instalments of not less than $1000 per annum, out of the proceeds of sales, whether of land or timber, if sufficient, and if not, then the said sum annually to be paid ' at all events,' and with this, *inter alia*, further stipulation, ' and it is further expressly agreed that no objection, exception or defence shall be made or taken by the said John M. Dickey, his heirs, executors, administrators or assigns, by reason of any allegation of the invalidity of the said clause of the will of Elliott Cresson, deceased, above referred to, or against the payment of the said sum of $10,000, or any part thereof, or of the said interest or taxes, or any other money or thing hereinbefore agreed to be paid or performed.' There was no personal bond accompanying this mortgage.

" Dr. Dickey paid at the time, or afterwards, as the cash part of the consideration-money, the sum of $5000. This conveyance was made to Dr. Dickey with the understanding that he was acting for Mrs. Dickey and all the parties claiming an interest in the lands, and that it would be a settlement of the suit in the United States Court. He was dealt with by the trustees as the representative of the whole family, the Dickey branch and the Cresson branch, and he had stated to Mr. Coppinger, one of the most active of the trustees, that ' he would withdraw the suit if an arrangement could be made to purchase the lands,' and Mr. Frederick Fraley, the only other one of the trustees examined upon the subject, testifies that he ' considered him as acting as the agent of

the parties concerned in the matter, and not dealing with the trustees for his own interest alone, but there was no agreement, either verbal or written, to that effect,' and that he 'consented to the sale in order to settle the suit, and to give the parties in interest any profit that might be derived beyond the price that was agreed to be paid for the lands, but there was no written stipulation, that I recollect, to this effect.'

"The purchase was intended for the benefit of the family; and about the time of the purchase (whether before or after is not ascertained), Dr. Dickey stated to Mrs. Elizabeth T. Cresson (wife of Warder Cresson), that he would give her 'a piece of writing' to secure her 'children and their rights' to these lands, 'and also he would give his wife the same to secure her children.'

"On September 5th 1860, the replevin suit was discontinued. It would seem that Dr. Dickey, upon taking possession of the lands, appointed David Carscaddon his agent to manage the same, but it was not until March 22d 1861, that a formal agreement between them was executed, by which it was stipulated that the said Carscaddon should assume the personal management of the said lands, and sell the same and the timber thereon, for which he was to receive as compensation one-third of the net proceeds of such sales, or, after the payment of purchase-money, interest, taxes and expenses, one undivided third part of the said lands.

"In November 1861 Warder Cresson died.

"On July 18th 1862, in reply to Clement Cresson asking for 'all particulars' in reference to the lands, Dr. Dickey wrote, among other things, as follows: 'Had I known the difficulties and risks I would not have had anything to do with them, but having expended so much it will be necessary for me to endeavor to recover it;' and then after stating amount of purchase-money paid by him, $15,000, taxes $1200 settled, arrears of interest and instalments of mortgage expended, $1300 to get timber not yet ready for market, his journeys to Clinton county, and his anxiety and trouble, he proceeds: ' Had your family paid a share of this money, then it would have been right to give you part in the title as you wished, but not having done so, I must make my advances safe. If there be any net return after all is paid, as at first proposed, I will surely give your family a share with my own; but of the result I am very doubtful, even if the trustees wait for payment, which they have at their option to do or not,' and that the costs of agency are great, money is difficult to get, and he had been called upon to pay $350 counsel fees in the suit with the trustees, 'which went against us,' and which he supposed the Cressons should pay, &c.

"On January 13th 1863, Mary Cresson (mother of Elliott and Warder and Annabella Cresson, and of Mrs. Dickey), died.

"On August 13th 1863, David Carscaddon wrote to the trustees that he saw that Mr. Coppinger, one of their number, as 'sole

surviving executor of, &c., Elliott Cresson, deceased,' was adver-
tising at Orphans' Court sale a part of one of the tracts owned by
Mr. Cresson, in his lifetime, and believed to be embraced in his
will to the trustees, and by them conveyed to Dr. Dickey, for
whom he is acting as agent; that he has not a shadow of doubt
that this tract was *intended* by the trustees and understood by
Dr. Dickey, as embraced in their deed to him, and requesting
they would give him their understanding of the transaction.

" On September 2d 1863, Eli K. Price, Esq., replied : ' It ap-
pears the tract you speak of is in Centre county, and the lands
devised to us, and by us conveyed to Dr. Dickey, are all in Clin-
ton county.'

" Dr. Dickey having purchased by deeds dated September 1st
1860, four tracts of land in Curtin township, Centre county, con-
taining, three of them, each 420 acres and 48 perches, and the
remaining tract 415 acres ; on January 17th 1865, he and David
Carscaddon agreed in writing with Ward McLean, of New York,
to sell to him ' the property known as the Cresson lands, situated
in Clinton and Centre counties, Pennsylvania,' and consisting of
seventy-five tracts, each of about 415 acres and 16 perches, &c.,
together with the undivided half interest of the said Carscaddon
in 329 acres, &c., the said McLean to pay for timber and logs
already cut, also timber in the boom at Williamsport, at cost rate,
and it being ' understood that some 420 acres in Centre county,
adjoining the above lands now in the warranty name of Valentine
Myers, which was originally a part of these lands, but to which
the title may have been lost by Orphans' Court sale, are to be in-
cluded in this sale, if the title can be recovered by reasonable
diligence and effort, and at reasonable expense ; the cost of such
recovery to be paid by said McLean or his assigns.'

" On June 9th 1865, Dr. Dickey, for the consideration stated
in the deed, of five hundred dollars, purchased the Valentine
Myers tract, containing 420 acres, more or less, ' being the piece
or tract of land sold by William Coppinger, sole surviving execu-
tor of Elliott Cresson, deceased,' &c.

" Under the above agreement, Dr. Dickey received from Ward
McLean $10,000 on account of the purchase-money, which sum
was forfeited because of his failure to comply with the terms of
the purchase.

" Some time about the fall of 1865, Dr. Dickey was reminded
of his promise to give ' a piece of writing ' to secure the Cresson
children and their rights to the lands, but he declined to give it,
because ' he had given sufficient in letters written to John E.
Cresson, and furthermore he had made provision in his will fully to
secure ' them, in case of his death.

" In November 1866, Dr. Dickey, through his then counsel,
Joseph C. Turner, Esq., for the consideration of $100,000, sold

and conveyed unto Ario Pardee the said 'Cresson lands,' consisting of seventy-six tracts of land, some situated in Clinton county and some in Centre county. Part of the purchase-money was paid in cash, but the whole of it was not realized until November 1867.

"On November 14th 1866, the mortgage executed by Dr. Dickey to the trustees, with arrears of interest, was paid, and on November 16th, the said mortgage was satisfied of record.

"The Cressons having heard of this sale, Mr. McAllister (one of the plaintiffs), at the request of Mrs. Elizabeth T. Cresson, wrote to Dr. Dickey that she would be glad to see him as soon as he could conveniently call on her.

"On November 22d 1866, he replied that on his return that afternoon from Clinton county, he was told of this short note, and says of it: 'A note similar to one from you some time ago, which I at once answered by calling on your mother, and when she wished me to give a *written* bond or pledge in reference to the interest of her children in the lands in Clinton county, which I *declined* to do, on the grounds that I had *purchased* them, which was my title, had great expense with them, and knew not that they would yield me anything, but that when sold and expenses paid with a proper compensation, they should receive a portion of the proceeds. * * * I say now I have sold the lands, but have not received enough in money to pay advances made and commission already paid, but when obligations given for one or two years are paid, a proper report and settlement will be made.'

"Subsequently Dr. Dickey sent to Alexander F. Porter (one of the plaintiffs), for the use of his wife and the other children of Warder Cresson, a 'statement of the distribution of the proceeds from sale of lands in Clinton county, bought from the trustees of Elliott Cresson by John M. Dickey,' dated December 24th 1866, showing expenses $41,177.70, balance for distribution $58,822.30, and distribution as follows: $10,000 to Dr. Dickey 'for labor and risk;' one-third net proceeds to D. Carscaddon, as per contract; one-third to children of Warder Cresson, and one-third balance; and setting forth 'The above statement is rendered in accordance with a promise given by me to the children of Warder Cresson, which promise I made and always held to be on no other grounds than those strictly of a family nature. The title was purchased under an appraisement of the court, the purchase-money for which is now in the hands of the trustees under the will of Elliott Cresson, where any legal satisfaction rests. The above sums will be paid (and I so instruct my heirs, administrators and assigns) so soon as the bonds given by A. Pardee, for one and two years, from November 14th 1866, become due and are paid, and with interest from that date, and when a proper receipt is given.'

"This statement was not satisfactory, and during 1867 there was

some correspondence looking to an amicable adjustment of the differences between the parties, but without result.

"To complete the history of the case, it should be stated that Dr. Dickey, in carrying out the purchase and in endeavoring to make the lands profitable, met with embarrassments and misfortunes; he was obliged to borrow quite largely to pay instalments, interest and taxes, and to build roads and dams, and defray the expenses of prosecuting the business of lumbering. In 1861 and 1862, money was scarce in consequence of the derangement of finances by the war; and so difficult did he find it to obtain means sufficient for his plans and purposes, that, seemingly despairing of success, he offered, without meeting a purchaser, to sell the whole or a part of the property at the rate it had cost him. The winters of 1862 and 1863 were unfavorable for lumbering, and in 1864 an ice freshet, and on March 17th 1865, a water freshet swept away great quantities of logs theretofore cut for market. It does not appear that the Cressons contributed, or were asked to contribute any of the money used or needed, or that they assisted or were asked to assist, in the operations on the lands.

"In 1860, wild lands in Clinton county were assessed at over fifty cents an acre, but evidence was offered that, in the estimation of persons well acquainted with the Cresson lands, fifty cents an acre, that is $15,000 for the whole tract, was rather above than below their real market value, and it would seem that after the close of the war they rose rapidly in value because, among other things, of the building of the Philadelphia and Erie Railroad, which runs along their front on the other side of the river.

"It was contended for the plaintiffs:—

"1. That the plaintiffs and Dr. Dickey and his wife were tenants in common of the lands in question, and that if one tenant in common purchases an outstanding title it enures to the benefit of his co-tenants—that the law raises an implied or resulting trust for them.

"2. That in the letters and papers in evidence there is an express declaration of trust by Dr. Dickey, that he was a trustee in fact of the plaintiffs in the purchase of the said lands.

"3. That Dr. Dickey was the agent of the plaintiffs, and as such purchased the said lands in their behalf.

"And for the defendants: * * *

"1. That Dr. Dickey was neither a tenant in common with the plaintiffs, nor an express trustee of or agent for them in the said purchase.

"2. That to hold Dr. Dickey as a trustee at all, there must have been mala fides in the purchase, or he must have got the lands at an inferior price, or there must have been a definite agreement upon sufficient consideration to buy for the plaintiffs, or the purchase-money must have belonged to them, or he must have ac-

cepted the lands with a trust imposed by the grantors at the time, and that the evidence establishes none of these things, but on the contrary it shows that Dr. Dickey bought as an independent purchaser, and that his promise to give the plaintiffs a share in the profits was a mere voluntary promise which cannot be enforced, and a breach of which does not make him a trustee.

"That the Statute of Limitations, Act April 22d 1856, sec. 6, settles this case, as no acknowledgment of the trust in writing by Dr. Dickey within five years before the filing of the bill has been shown." * * *

The report proceeded : "Before his purchase from the trustees in May 1860, Dr. Dickey neither had nor claimed to have any title whatever to the ' Cresson lands.' If the devise to the trustees had been decreed to be inoperative and invalid, then, whether, as contended on the one side, the lands would fall into the residuary estate and pass to the residuary legatees, or, as contended on the other side, the testator would be held to have died intestate as to the lands, and they would pass to the heirs at law (questions which it would answer no profitable purpose now to discuss), it is very certain that they would not have passed to Dr. Dickey, for he was neither a residuary legatee nor an heir at law— he was a stranger to the blood of the testator, a stranger to the will, and, even under the family agreement, a stranger to the title. Nor was Mrs. Dickey a tenant in common with the plaintiffs ; she claimed only an undivided part of the lands, and that as an heir at law, while they (excepting Mrs. Porter, who claimed nothing) claimed the whole as residuary legatees ; her title was adverse to their title ; if she had any title, they had none, and vice versa ; none of them were in possession, and although, under the family agreement, she and they were to be entitled in common, she was not the purchaser from the trustees. Assuming then that Dr. Dickey purchased the lands under an agreement with or promise to the plaintiffs that they, as children of Warder Cresson, should share in the purchase, if he and they were not tenants in common before the purchase, and if therefore a breach of the agreement would not make them tenants in common, the master is unable to see how, on the ground of a tenancy in common, he is to be held accountable as a trustee.

"But on other grounds, the master is of opinion that the plaintiffs are entitled to an account as prayed by their bill, and that Dr. Dickey is a trustee, if not by express declaration, by implication and construction of law.

"That the family arrangement by which the conflicting claims between the heirs at law and the residuary legatees were adjusted, and in pursuance of which the suit in the United States Circuit Court contesting the validity of the devise to the trustees was instituted, was an efficient contract, the master does not question.

[Dickey's Appeal.]

It was not necessary that as an agreement it should be in writing. This is not seriously disputed, but it is contended that the agreement extended no farther than the suit, that it ended with the decree sustaining the devise—that the whole matter of the appeal was a mere voluntary thing on the part of Dr. Dickey—that he had a right to abandon it, and did abandon it, and that afterwards, dealing with the trustees, as he had a right to do, as an independent purchaser, he bought for himself and paid with his own money the full value of the lands, and that therefore under no authority of equity can he be held accountable as a trustee. * * * If the family agreement fell with the decision of the Circuit Court on October 9th 1857, then Dr. Dickey's letter of August 10th 1859, and John E. Cresson's reply of September 1st 1859, taken together, either revived it or constituted a new agreement, and if a new agreement, under which of them were the parties acting when they joined in the replevin suit in March 1860? Neither the old nor the new agreement provided in terms for contesting the trustees' title by such a suit, and without some amicable adjustment of their conflicting claims, the interests of Mrs. Dickey and the Cresson children, as has been seen, were adverse, and no other or third agreement has been shown. * * * The trustees' title was to be got out of the way by one means or another before either the heirs at law or the residuary legatees could successfully assert their own title, and thus carry out the compromise not to oppose the title of the one against the title of the other, but to divide the property between Mrs. Dickey and the Cresson children. To this end the suit in the Circuit Court was brought by John E. Cresson, the appeal was taken at the suggestion of Dr. Dickey, and he and the Cressons joined in the replevin.

"But it is said that Dr. Dickey's letter was addressed to John E. Cresson alone, and even if this letter and the reply taken together *do* constitute an agreement, it was an agreement only between these two, and not with the Cresson family. The answer is threefold—first, the reply shows that John E. Cresson was writing for himself and his brothers; second, he, as the representative not only of the Cresson family but of all the parties to the family agreement, was the complainant in the bill; and, third, * * * the parties were not acting and dealing formally, as strangers, at arm's length; they were working together for a common purpose *as a family*, each for himself and the others, and all against the title of the trustees, * * * and Dr. Dickey acting with them, as one of them, the eldest male member of the family, and its adviser, not only on behalf of his wife and their children, but also on behalf of the children of Warder Cresson, whom * * * he regarded as 'more than fatherless,' and to whom he stood *quasi in loco parentis*, in their efforts and endeavors to get possession of these lands. It may be that the suggestion of the appeal in Dr.

[Dickey's Appeal.]

Dickey's letter was merely voluntary on his part, and that he was not bound to assume the payment of all the costs and charges of it if unsuccessful, but John E. Cresson having acceded to the plan proposed in the letter, and having done all he was requested to do, viz. : executed the power of attorney, authorizing counsel to appeal, and the appeal having been thus taken, and Dr. Dickey thus representing the complainant with counsel, it seems to the master that, independently of the obligation resting upon Dr. Dickey as a member of the family, here was an especial obligation imposed upon him to act on behalf of all concerned; and if he had a right to abandon the appeal without the consent of or notice to the Cressons, he certainly had no right to abandon it for his own benefit, or to use it in any way in which the Cressons would not be equally, interested. * * * The appeal was not abandoned when, on March 14th 1860, Dr. Dickey joined with the Cressons in the replevin, or when, some time between this date and April 6th 1860, Dr. Dickey approached the trustees with an offer to purchase the lands. Up to at least the date of the replevin * * * it is clear beyond question that they were acting together as members of a family in pursuance of an understanding between them, the object of which was to obtain the lands held by the trustees and divide them, one-half to Mrs. Dickey and the other half to the Cresson children.

" The trustees were in difficulties * * *; the suit had cast a cloud upon their title, and the appeal threatened to increase their expenses, and the replevin to cut off their only source of revenue. In this condition of things, Dr. Dickey, referring to the trustees' embarrassments, and, among other things, expressing his confidence ' that that decision (of the Circuit Court) would be set aside by the court at Washington, and his desire to help these more than ' fatherless children,' made a general proposition to purchase the lands. Whether or not he originally intended this proposition as made by him ' as an independent purchaser,' that is, as made by himself alone for himself alone; it is very clear from the evidence that the trustees did not consider him as such or deal with him as such, nor did he as such carry on the negotiations with them. He and they could not agree as to terms, and two appraisers were selected to designate a price for which it would be advisable for the trustees to sell, not to Dr. Dickey, but ' to parties representing the legal heirs of the said Elliott Cresson,' and these appraisers on April 6th 1860, reported ' that a fair valuation of the said lands, under all the circumstances, would be the sum of $15,000. * * * It may be fairly and reasonably inferred that the difficulties in which the trustees were involved, and that the purchasers were to be, not strangers, but representatives of the testator's family, who were claiming a title to the property, were at least among the circumstances that thus controlled their opinion,

and, if so, induced them to fix a lower price upon the lands than they would otherwise have done.   That Dr. Dickey so thought * * * is quite clear from his letter of the same date with the report, to the chairman of the trustees, conditionally accepting or agreeing to take the lands at their appraised value.   '*For Sarah E. Cresson his wife and residuary legatees mentioned in the will of Elliott Cresson,*' he signifies his willingness '* to pay that amount on behalf of the heirs of Mr. Cresson, *provided* the terms of payment are made such as *to counterbalance* in some respect what he considers the full value of the land sold *under any circumstances*, and *provided* also the money due for logs lately cut from the property and only partially removed may be used in part payment,' and then he submits his terms, $5000 in four equal payments within nine months, and a mortgage for the balance, payable in ten years.

" The trustees accepting the offer substantially as thus made, the purchase was consummated on May 19th 1860. * * *   This testimony would seem to show pretty conclusively that the trustees were not negotiating with Dr. Dickey as ' an independent purchaser,' but as the representative of the family ; that the sale was made to him not for himself but for the family, and in terms including a settlement of the controversy between them and the family—in short, as a compromise between them.   And so it would appear Dr. Dickey regarded the transaction at the time." * * *

After referring to testimony bearing on this point and discussing it, the report proceeds :—

" But it is contended in the argument and by Dr. Dickey, in his answer, that ' for these promises and declared purposes there never was the slightest consideration whatever, they were purely voluntary offers of my own.'   This may be conceded so far as it may mean that the Cressons did not pay down any part of the cash purchase-money, but if a compromise be a sufficient consideration for a promise, and it will not be questioned that it is, then it seems to the master that there was sufficient consideration here, for the purchase was the result of a double compromise—a compromise between the family of their conflicting claims, and a compromise between Dr. Dickey, representing the family, and the trustees, without which it does not appear that he would have been able to purchase on such favorable terms, either as to price or payment, even if he had been able to purchase at all.   Besides, if these promises were mere gratuities and not made in pursuance and on the consideration of the family agreement, and what had been done by Dr. Dickey and the Cressons under it and in furtherance of it, how and from whom and for what consideration did Dr. Dickey or his admitted agent, Mr. Carscaddon, derive the authority to discontinue the replevin suit on September 5th 1860 (several months after the purchase), and thus obtain the benefit

' of the money due for logs lately cut from the property, and only partially removed,' in part payment of the purchase-money, as stipulated for in his letter of April 6th 1860, to the trustees, submitting terms of purchase on behalf of his wife and the residuary legatees ? The replevin had been instituted by him and the Cressons together ; and attempt to explain this discontinuance as one may, the explanation will lead back to the original family agreement, and disclose the consideration and the authority for everything done by every member of the family and Dr. Dickey as one of them, acting with them and for them, to get the lands from the trustees and divide them between Mrs. Dickey and the Cresson children.

" And here would seem to be the appropriate place to notice the argument founded on the fact that the appeal to the Supreme Court still stands open on the record, and the only notice it is deemed necessary to take of it is this: the appeal and the replevin were but parts of the same machinery, put in motion to effectuate the purpose of the family agreement, and while they failed of directly wresting the title from the trustees, they contributed, as has been seen, to induce the trustees not only to sell to Dr. Dickey, representing the family, but to sell on favorable terms ; and if it was right in Dr. Dickey to discontinue the replevin it would be as inequitable as it would be useless for the plaintiffs to proceed with the appeal. The whole controversy ended as it was promised by Dr. Dickey, and understood by the trustees, and intended by all the parties that it should end, in and with the purchase. * * *

" And as to the explanation set forth in the answer, it is sufficient to say that the impecunious and comparatively helpless condition of these children of Warder Cresson was as well known to Dr. Dickey before as after the purchase ; it was used by him as an argument to induce the trustees to sell to him that they might be benefited, and, as has been seen, was among ' the governing reasons with Mr. Coppinger, and others of the trustees, to accept Dr. Dickey's proposition' to purchase ; it was not expected or intended that they should assist, nor does it appear that they were ever able or were ever requested to assist, pecuniarily or otherwise.

" That Dr. Dickey encountered unexpected difficulties in carrying out his purchase and in managing the lands, may be conceded, and he may be entitled to a liberal measure of credit for overcoming them ; but these difficulties resulted chiefly, if not exclusively, from the derangement of business in consequence of the war, and from unfavorable seasons and floods or freshets, matters over which the plaintiffs had no control, and for which it would scarcely be equitable to hold them responsible. Nor can the attitude of the parties be changed or affected by anything shown to have occurred after the purchase ; their status and respective rights and responsibilities were fixed at the date of the purchase ; and

looking back to that date and considering the confidential relation between them, the family agreement and what had been done under it, and all the circumstances which induced the trustees to sell, and which enabled Dr. Dickey to buy, it seems to the master that Dr. Dickey placed himself and was intended to be placed in the position of a trustee to the plaintiffs, and that his letter of May 18th 1860, candidly read in this light, was an informal declaration or confession of the trust. It certainly was not understood by the plaintiffs or the trustees, nor was there anything then said or done by Dr. Dickey which would give them to understand that the interest of the plaintiffs in the purchase was to be a mere matter of favor and not a matter of right. That the plaintiffs did not so understand it, is manifest from the correspondence between them and Dr. Dickey, and that the trustees did not so understand it, is clear from the whole dealings between them and Dr. Dickey. It is clear that the sale was made to him as the representative of the family, and that excepting as such representative it would not have been made to him at all at that time or on such favorable terms, and that entering into the consideration for it and of it were, among other things, the settlement of the controversy between the trustees and the family and a beneficiary purpose in favor of the family, and especially of the plaintiffs, who were deemed peculiarly unfortunate. If, then, the letter of May 18th 1860, shall not be read as an informal declaration or confession of a trust, assumed and imposed at the time and supported by abundant consideration, it seems to the master that Dr. Dickey must be held accountable on other grounds; that is, as a trustee by construction of law. One class of this sort of trusts, and it may be proved by parol, is where the acquisition of the legal estate is tainted with bad faith. The rule of the authorities is that if a person gets property which otherwise he would not have got at all, or gets it at a better bargain than he would otherwise have got it, by representing that he will hold it or use it or is purchasing it for another, equity will turn him into a trustee, ' to get at him,' and *a fortiori* if a confidential relation exists between the parties, or the party by the influence of whose name the title has been acquired had a previous interest in it or claim to it. * * * Now, it seems to the master that this rule may be properly applied to the present case, if Dr. Dickey, dealing as the representative of the family with the trustees and making the purchase under the circumstances here disclosed, only intended that whether or not the plaintiffs should have any interest in the property or its proceeds, should be optional with himself, and if they should have any interest at all, it should be only such interest as he might choose as a matter of grace to bestow upon them." * * *

As to the limitation under the Act of 1856, the master said: " Dr. Dickey's letter of November 22d 1866, to Mr. McAllister,

one of the plaintiffs, was a sufficient acknowledgment of the trust within the limit of the statute,—and if it was a trust by reason of bad faith, it does not appear that the mala fides was discovered or discoverable until after Dr. Dickey rendered his account on December 24th 1866.

" Upon, then, a careful consideration of the whole case, the master is of opinion, and so reports, that Dr. Dickey is accountable to the plaintiffs, as a trustee, as prayed in their bill, and that David Carscaddon, as the admitted agent of Dr. Dickey, was agent also of the plaintiffs, and as such should account to them ; but it is not perceived on what grounds Mrs. Dickey is accountable, and as to her the bill should be dismissed, and a form of decree to this effect is accordingly annexed."

Exceptions to the report were filed with the master and overruled by him. His report having been made to the court, the cause was referred to him to state an account between the parties.

At the second hearing before him, Dr. Dickey under protest presented an account headed : " John M. Dickey in account with Cresson lands in Clinton county, including all moneys paid and received in the purchase, management and sale, viz., seventy-two tracts."

The debits were for cash received for timber, forfeit by W. McLean on articles for sale of Clinton county land with interest on the several sums.

Also : ".Cash and notes from A. Pardee, deducting 1665 acres in Centre county, which were not bought from the trustees under the will of Elliott Cresson. As the sale to Mr. Pardee was not by the acre, but as a whole, it is necessary to estimate the land in Centre county by its relative value, which I do at $10 per acre.
　　　　　　　　　　　　　　　　　　　　　　　　　　$83,350."

Also : " To proceeds of lumber taken from the lands by D. Carscaddon, of which no account was rendered in my former report to the family of Warder Cresson, that report referring entirely to the proceeds from the sale of the lands, there being no proceeds of lumber, but what went to the land in payment of taxes, interest, making roads, dams, &c. Besides, the proportion offered them from that source, I deemed sufficient when added to the large sums they received by will from Mrs. Mary Cresson in 1863, fulfilling my promise to them, and regarding myself in no sense their trustee　..　.　.　.　.　.　.　$67,131.41

The whole amount of debits was :　.　.　$162,950.63

The credits were for expenses in travelling, searches, court charges, taxes and interest on outlay, on mortgage and money borrowed, &c. Also the amount of purchase-money paid to the trustees.

Also : " Cash to Joseph C. Turner, Esq., proportion of commissions on sale　.　.　.　.　.　.　$4,162.50

[Dickey's Appeal.]

"Cash to Rev. Thos. McCauley for services and expenses as per agreement; proportion for lands in Clinton county $416.25

"Amount due Jas. David, H. Speering and C. David, exploring and estimating timber employed by W. McLean and his bills accepted by D. Carscaddon . . . . . $508

"Cash advances to J. L. Proctor in consideration of his losses on lands . . . . . . . . $455

"Payments of D. Carscaddon . . . $73,061.40

"Services of self in purchase, management and sale . . . . . . . $10,000"

The whole amount of credits was: . . . $105,874

"One-third net proceeds as per agreement to David Carscaddon . . . . . . $19,025.39

Balance . . . . . . . $38,050.77

$162,950.63

The plaintiffs objected to all the items in this account, except the purchase-money to the trustees, $15,000 and interest; six years' taxes on the lands $6000, and interest.

Very much testimony in support of Dr. Dickey's account and against it, was taken by the master.

One of the items in his account was on the ground, that as the sale to Pardee was "a lumping sale," including in it lands of Dickey in Centre county, as well as the Clinton county lands, the respective values of those lands should be considered, and Dickey should be charged only with such portion of the purchase-money as should remain after deducting the value of the Centre county lands. On this question the master reported:—

"The master cannot think so. It is true that the evidence shows that the Dickey tracts were more favorably located than the Cresson tracts, were much better timbered and could be used (as the larger portion of the Cresson tracts could not) as farm land after the timber should be stripped from them, and were consequently much more valuable than the Cresson tracts. But what difference can it make whether or not the Dickey tracts were worth $10 or $15 an acre and the Cresson tracts only about $3 an acre? It nowhere appears that Mr. Pardee or any one for him visited the lands to examine them, or visited them at all. He would seem to have relied entirely upon the representations, as to their condition and character, made to him by Mr. Turner, the agent employed by Dr. Dickey to negotiate the sale, and what these representations were the evidence does not disclose. It is not shown or even pretended that Mr. Pardee was induced to make the purchase by the real or represented superiority of the Dickey tracts, and there is nothing in the proofs, from which it can be conclusively inferred,

that he would have bought these tracts alone, or the Cresson tracts alone, or paid more for the former and less for the latter, than at the rate he agreed to pay and did pay for the whole. He paid $100,000 for the whole, comprising seventy-six tracts of an ascertained number of acres each, apparently without regard to the comparative value of any particular acres or tracts. In this condition of things, where no distinction is made as to the respective values of the component parts of a body of land purchased as a whole, there is no rule of law or equity with which the master is acquainted, which would authorize or justify a distinction as to the purchase-money, and settled law of the relation between Dr. Dickey and the plaintiffs will not permit him to derive any especial individual advantage from the bargain in this case. The whole tract sold to Mr. Pardee contained 31,563 acres and 32 perches, of which the four tracts owned by Dr. Dickey contained 1676 acres, and the 72 tracts of the Cresson land contained 29,887 acres and 32 perches, and in the proportion of the Cresson land to the whole land, he has been charged with the purchase-money."

After considering and allowing other credits in Dr. Dickey's account, the master reports :—

" 5. As to credit claimed for amount retained to pay Messrs. Davids and Speering, exploring and estimating timber, employed by Mr. McLean, and for which Mr. Carskaddon, acting for Dr. Dickey, made himself responsible.

" After Ward McLean had contracted to purchase the lands, he wished to have them explored and the timber upon them examined and estimated. Mr. Carskaddon introduced Messrs. Davids and Speering, as competent parties for the purpose, who were willing to undertake the business, but not, as it would seem, on the sole credit of McLean, a stranger to them, and Carskaddon engaged to be responsible for him. They were on the land for weeks making examinations, and McLean paid them by a draft, endorsed by Carskaddon, on a Mr. Page of Boston, for or with whom McLean was acting in the purchase. This draft was discounted at the bank in Lock Haven, but before it was paid, Page died, and the bank placed it in the hands of their attorney for collection. It has not been paid, nor does it appear that any steps have been taken to exact payment from Carskaddon, but it is contended, nevertheless, that as Carskaddon, and therefore Dr. Dickey, is liable for the amount thereof, the credit should be allowed. Why? It is not shown beyond doubt that Carsdaddon's liability was not assumed rather for the accommodation of McLean, to enable him to sell to advantage to others, than to assist him to complete his own purchase and thus benefit the trust. And conceding the principle, that a trustee is as fully entitled to credit for money for which he is liable as for money actually paid in furtherance of the trust, it is evident that such liability must be, not a primary, but an ulti-

23 P. F. SMITH—16

mate liability.   The ultimate liability for this debt rests upon
McLean or Page's estate, or, it may be, on both; and it has not
been shown that they are, or either of them is, insolvent, and that
therefore the defendants must ultimately be obliged to pay.   And
again, the master has not been able to satisfy himself that a trust
estate should, in any event, respond for a liability of this sort, and
he has accordingly disallowed the credit.

" 6. As to credit claimed for money advanced or rather pre-
sented to J. L. Proctor in relief of his losses incurred in operating
on the lands.

" Proctor agreed in the winter of 1861 or in 1862 to log off the
lands for Dr. Dickey and Carskaddon, on terms by which, in con-
sequence, as it would seem, of the unfavorable character of the
season and the rise in the price of labor, he lost almost all he
owned, and they released him from his contract.   He continued,
however, in their employ at wages, until after the memorable freshet
of 1865, when the lumbering operations ceased.   Out of consider-
ation of his misfortunes, and apparently to give him another start
in the world, the money for which credit is here claimed was pre-
sented to him.   The money was actually paid, and, it must be
admitted, for a laudable object; but as the plaintiffs except to it,
not very graciously, as it strikes the master, he does not perceive
on what grounds he can allow it, and the credit is therefore
refused.

" 7. As to claim for commissions.

" It is contended that this should be disallowed, because—(1)
Dr. Dickey denied the trust; (2) He did not render a correct
account; and (3) It is excessive."

The master elaborately considered all the objections to this
credit, in connection with the evidence bearing upon it, and reported
that the credit should be allowed.

The master also allowed the credit for the one-third paid D.
Carskaddon and the other items of the account, not before speci-
fied, and concluded his report:

" Correcting the account brought in by Dr. Dickey in the par-
ticulars indicated, and carrying the corrections through both sides
of the account, the master submits and annexes a statement of
account in conformity with the opinions herein expressed, by which
it will appear that there is due from Dr. Dickey to the plaintiffs
the sum of $22,796.95, with interest from November 14th 1866,
or to each of the plaintiffs, John E. Cresson, Clement Cresson,
Ezra T. Cresson, Annabella McAllister, Emma Porter, and Ezra
T. Cresson as executor of Jacob Cresson, deceased, the sum of
$3799.49, with interest from said date."

A stated account in detail showing this result accompanied the
report.

[Dickey's Appeal.]

Both parties filed exceptions with the master to the report. Those by Dr. Dickey were :—

1. Because the master has not allowed John M. Dickey a credit for the value of his private lands in Centre county, viz : 1676 acres, which the evidence showed was worth from $10 to $20 an acre.

2. Because the master has not allowed defendant credit for $455 paid to J. L. Proctor.

3. Because the master has not allowed defendant credit for $508, for which the defendants are liable to James David and others.

4. Because the master has reported that John M. Dickey should be charged with interest from November 14th 1866.

Those by the plaintiffs were :—

1. Because the master has erred in allowing a credit under date of March 17th 1860, the sum of $42.80 expenses for Dr. Stone and the respondent to the land.

2. Because the master has erred in allowing a credit for cash paid James C. Turner, Esq., for commissions under the date of the 15th of November 1866, the sum of $2367.25.

3. Because the master has erred in allowing a credit under the date of the 20th of November 1866, for cash paid the Rev. Thomas McCauley, for services in efforts to sell the land, the sum of $473.45.

4. Because the master has erred in allowing the sum of $624, interest on those sums.

5. Because the master has erred in allowing the sum of $73061.40 as a credit in said account for expenses paid to David Carskaddon for lumbering, &c.

6. Because the master has erred in allowing a credit of $10,000 to John M. Dickey, for commissions as the trustee of the estate.

7. Because the master has erred in charging Dr. Dickey upon the debit side of the account only, with the sum of $94,690.02, as the proceeds of the sale of the land to Pardee, when the uncontradicted testimony in the cause showed that he paid the defendant the sum of $100,000.

All the exceptions were overruled by the master, and his report unchanged made to the court was confirmed *pro forma* April 17th 1871.

Both parties appealed to the court in banc.

The assignments of error by Dr. Dickey were :—

1. Because the court did not dismiss the bill.

2. Because by confirming the first report of the master the court held that Dr. Dickey was accountable to the plaintiffs as a trustee.

3. Because the court held Dr. Dickey to be a trustee, without stating under which of the several allegations in the bill he was to account.

4. Because the evidence shows that neither Dr. Dickey nor

David Carskaddon was liable to account as trustee or otherwise to the plaintiffs, or to any of them.

5. Because the court made Dr. Dickey accountable as a trustee to the executor of Jacob Cresson, when there was no proof of his death, of any letters testamentary, or administration, or of his heirs or next of kin.

6. Because the court did not dismiss the bill as being barred by the Act of 1856, April 22d.

7. Because the court did not allow Dr. Dickey a credit on the account for the value of his private lands in Centre county, viz.: 1676 acres, which the evidence showed were worth $10 to $20 an acre.

8. Because the court did not allow Dr. Dickey credit for $455 paid J. L. Proctor.

9. Because the court did not allow Dr. Dickey credit for $508, for which he and David Carskaddon's estate are liable to James David and others.

10. Be cause the court charged Dr. Dickey with interest from March 14th 1866.

The errors assigned by the plaintiffs were, the refusal to allow their exceptions to the report of the master on Dr. Dickey's account.

The case was argued January 6th 1873, (Justice SHARSWOOD being at Nisi Prius), by *Porter* and *W. L. Hirst* (with whom was *G. Junkin*) for Dr. Dickey; and by *G. W. Biddle* and *A. V. Parsons* for the Cressons. The decree at Nisi Prius was affirmed by a divided court.

A reargument having been ordered, it was again argued by *Porter* for Dr. Dickey, and *G. W. Biddle* for the Cressons.

The space necessarily taken by the report of the case will not permit presenting the argument of counsel in a way which would do justice to them or to the case.

The opinion of the court was delivered, March 17th 1873, by

SHARSWOOD, J.—It will be necessary to inquire and determine what was the relation sustained by the defendant to the plaintiffs on May 16th 1860, when the trustees under the will of Elliott Cresson, by deed of that date conveyed to him the Clinton county lands. For this purpose it will not be required that we should enter upon a full examination and discussion of all the evidence which is spread upon the paper-books. A few indisputable, and indeed, undisputed facts, have led a majority of the court to the conclusion that Dr. Dickey did then occupy a confidential relation to the plaintiff; that he had that " community of interest," which, in the language of Chief Justice Lewis (1 Casey 272), " produces community of duty."

By the will of Elliott Cresson the lands in Clinton county had been devised to certain gentlemen as trustees "for the foundation and support of a home for aged, infirm, or invalid gentlemen and merchants." After giving many legacies, he bequeathed the residue of his estate in equal proportions to the children of Warder Cresson, his brother, then living. He left surviving him as heirs at law, his mother, Mary Cresson, his brother, Warder Cresson, and two sisters, Annabella Cresson, and Sarah E. Dickey, the wife of the defendant. Mary Cresson, Annabella Cresson, and Warder Cresson, are dead, leaving as the heirs at law of Elliott Cresson, the children of Warder, who are plaintiffs, and Sarah E. Dickey.

Elliott Cresson died February 21st 1854, and his will was admitted to probate on the twenty-seventh of that month. John E. Cresson, then a citizen of New Jersey, on October 16th 1856, filed a bill in equity in the Circuit Court of the United States for the Eastern District of Pennsylvania, against the executors and trustees, the heirs at law, and the rest of the residuary legatees, charging that the devise to the trustees was invalid, and that by reason thereof, the said lands constituted a part of the residuary estate. The defendant and his wife answered, that they were advised that the devise was invalid, as alleged, but charged that the testator died intestate as to said lands. According to the report of the master, it seems to have been informally agreed between the parties contesting the validity of the devise, that, if it should be decided to be void, whatever might be their respective rights, Sarah E. Dickey, as the only surviving sister of the testator, should have one-half, and the children of Warder Cresson should have the other half of the lands. On the 9th of October 1857, the said bill, after argument, was dismissed, the court deciding in favor of the validity of the trust. As far as it appears, the community of interest created by the previous agreement between the plaintiffs then ended. Warder Cresson was then alive. His children, the plaintiffs, were not tenants in common, as heirs at law, with the defendant. Mrs. Dickey, however, as heir at law, was a tenant in common with her brother Warder, of whatever title there might be in them to these lands. It is unnecessary to consider what the effect in equity of a purchase by Dr. Dickey would have been at that time as to Warder Cresson, who, by the express terms of the codicil, was excluded from any benefit in the estate: "In no event shall any portion of my estate be diverted from the object designated for the benefit of said Warder Cresson." We may concede that after the decree of the court, Dr. Dickey and his wife were strangers to the plaintiffs, and had no community of interest which could lay the foundation for a relation of confidence. Had Dr. Dickey rested there, he might have purchased the lands for the benefit of his wife exclusively, and having paid

[Dickey's Appeal.]

his own or her money, no declaration, not supported by a consideration, or under seal, which imports a consideration, whether such declaration had been verbal, or evidenced by writing, would have constituted him a trustee for the plaintiffs. If he had intended, and so communicated to the plaintiffs that he would divide the net proceeds of the sales and lands, after the payment of expenses, if they contributed nothing in time, labor or money, which would constitute a sufficient consideration, it would have been a nude pact not enforceable in equity. What occurred afterwards, however, placed him in a different position. The defendant was not content to accept the decree of the Circuit Court of the United States against the title which had been set up in the bill in equity. He assumed to act on behalf of John E. Cresson—the plaintiff in the Circuit Court—and retained counsel to prosecute an appeal to the Supreme Court of the United States. He communicated what he had done to John E. Cresson, by letter dated August 10th 1859. "I have assumed to pay the necessary charges, and given a fee to Mr. Campbell, and he engages to take an appeal to the Supreme Court of the United States. It may not amount to anything, but in that case you will not have any costs; but if it does, it will be proper to tax you and the rest of the family with their share. The arrangement your Aunt Sarah (Mrs. Dickey) and I agreed to with the attorney, was to unite the claim of her as the legal heir, with all the children of brother Warder as residuary legatees (he being cut off by the will,) and as a just arrangement, to make it without a trial of ownership afterwards. This was done, as I suppose you know, in the previous trial, and I suppose it is best in this." What had thus been done was ratified by John E. Cresson, acting for himself and the other plaintiffs, by a letter to Dr. Dickey, dated September 1st 1869, in which he said: "I trust that we may be successful in the undertaking; as it would be very unpleasant to us all to have a trial with Aunt Sarah for the ownership of the lands, it is with pleasure we accede to the plan you propose." Surely here was an agreement founded upon sufficient consideration; the defendant, Dr. Dickey, agreeing to conduct and be at the costs of the appeal in the event of failure, and the plaintiffs agreeing, in consideration thereof, to abandon their claim as residuary legatees, and come in equally with Mrs. Dickey as heirs at law in case of eventual success. Dr. Dickey avers that he afterwards abandoned this appeal, but it is clear that after this agreement he had no right to do so without the consent of the other parties. He had constituted his wife a tenant in common in equity with them of the title, such as it was. Mrs. Dickey, with his consent, might release her own share or interest to the trustees, but Dr. Dickey was, nevertheless, bound to go on with that appeal until he was released by the other parties from the obligation he had assumed with them, and for which they had

given value in their release of their rights as residuary legatees. It is entirely immaterial, so far as any question before us is concerned, whether the title they thus set up in opposition to the trustees of the will, was good or bad, was perfect or worthless; whether, if the trust was bad, the heirs at law would have the lands, or the residuary legatees. The relation of Mrs. Dickey, and as standing in her shoes, of Dr. Dickey, to the other parties, cannot be affected by that consideration. That Dr. Dickey, then considered that he stood in this relation to the plaintiffs, is manifest, we think, from the terms of his formal proposal in writing made to the trustees for the purchase. He says that he is willing, " on behalf of the heirs at law of Mr. Cresson," to pay the amount at which they were appraised by Messrs. P. M. Price and Stone, and he subscribes his name " for Sarah E. Cresson, his wife, and residuary legatees mentioned in the will of Elliott Cresson." If then Mrs. Dickey was in equity a tenant in common with the plaintiffs, any purchase made by her, or by her husband in her behalf, of the outstanding title in the trustees, must enure to the benefit of her co-tenants at their election. In Smiley *v.* Dixon, 1 Penna. R. 441, Huston, J., refers to the case of Legget *v.* Bechtol, which is not reported, in which it was decided by this court that two tenants in common, who had heard of an adverse title, and agreed to join in defence against it, were bound to deal fairly with each other, and that one of them, who purchased the adverse title, must hold it for the other, upon that other paying his proportion of the purchase-money. So in Weaver *v.* Wible, 1 Casey 270, it was held that a conveyance to one of several tenants in common, or a deed to one of two devisees of the same land, shall enure to the benefit of all who come in under the same title, and are holding jointly or in common. To the same effect is Lloyd *v.* Lynch, 4 Casey 419, and Keller *v.* Auble, 8 P. F. Smith 410. In answer to a letter of John E. Cresson, of May 4th 1860, who, it seems, had heard of the purchase, and wrote to inquire about it, Dr. Dickey, under date of May 18th 1860, replied as follows : " The title I took without having your brother associated in it, because the person furnishing the money to purchase, and running the risk, must necessarily have the property in his right as security ; and again, your brother cannot give you such security in a contract to the proper execution of his part as one having other property can do, so that the danger is only to myself. I expect to sign a paper to be left with your mother, as representing her children, so soon as I get the deeds recorded, binding myself and heirs, to give your brothers and sisters the one-half of all the net proceeds from the property, and your Aunt Sarah, for our children, the other half, after paying purchase-money, interest and expenses of every kind, which must first come out of all sales of lands and timber." It will be observed that he

[Dickey's Appeal.]

made no condition that the plaintiffs should advance any part of the purchase-money, but distinctly proposed to depend for his re-imbursement upon the sales of lands and timber. He stated also in this same letter that he made this purchase of the trustees by way of compromise of the pending appeal by the advice of the counsel whom he had retained for the heirs. "Your lawyer, Mr. Campbell, as well as my own, told me to make any compromise I could with the trustees, as there was everything to fear, if we went to the Supreme Court, that it would result as the former did, against us." Whether, therefore, Dr. Dickey be regarded as acting for his wife as tenant in common, and having himself a curtesy estate in her share, or as attorney in fact of the other parties, in prosecuting their appeal, in either view he occupied a confidential relation, and any purchase made by him must be held in equity to enure to them and according to their respective shares. We are therefore of opinion that Dr. Dickey was a trustee, and the decree below that he should account as such was right.

In regard to the questions growing out of the account, we concur with the learned master below upon all points except one. We think Dr. Dickey should be credited with the fair market value of his own lands, which were included in the sale. It is altogether immaterial how Mr. Pardee, the purchaser, regarded it, and whether he viewed the lands in person. This is not the ordi-nary case of a person executing an express trust, where it may be said that it was the plain duty of the trustee to keep his own lands separate from those of his cestui que trust. Dr. Dickey was not a lawyer, and not acquainted with the doctrines of courts of equity upon the subject of constructive trusts. He was advised by his counsel that he was not a trustee, and the division of opinion upon this bench may at least show that it was not a clear case. He held himself bound *in foro conscientiæ* only. It would be a hard measure of equity to visit him with the loss of his own lands or their value, because, supposing himself not legally accountable to any one, he made a lumping sale of his own land with the lands of the cestui que trust. There is no difficulty in separating and distinguishing them, and so far from the Clinton county lands having been injured by this confusion, if we may judge by the testimony of the witnesses as to the actual value of the Clinton county lands, compared with what they were sold for by Dr. Dickey, they were very much benefited. Nor is there any diffi-culty in determining the value of these lands. The only witness who speaks of it from actual knowledge is Mr. Carskaddon, and he was an entirely competent expert. He says: "These lands are very favorable specimens, worth from $10 to $15, or $20 an acre." We lay aside what Dr. Dickey says, as evidently mere conjecture. Taking then $14 as an average for 1676 acres, de-ducting $3.16 per acre, the amount at which he is already credited.

[Dickey's Appeal.]

and crediting him with the same proportion on the forfeit of Ward McLean, it will be found, without calculating the precise arithmetical result, that if Dr. Dickey be credited with these sums, the amount due the plaintiffs is somewhat less than that brought out on the first statement of Dr. Dickey, dated December 24th 1866, and offered to be paid by him, namely: $16,274.10. We think the decree below ought to be so modified as to find this amount to be due and payable to the plaintiffs, with such an order as to the costs as will be just and equitable.

And now it is ordered and decreed that the defendant, John M. Dickey, pay to each of the plaintiffs, John E. Cresson, Clement Cresson, Ezra T. Cresson, Annabella McAllister, Emma Porter and Emma J. Cresson, as executors of Jacob Cresson, deceased, the sum of $2712.35 cents, with interest from November 14th 1866; that each party pay his own costs in the court below; that the appeal of the plaintiffs be dismissed at the costs of the appellants, and that the costs of the appeal of John M. Dickey be paid by the appellees.

WILLIAMS and MERCUR, JJ., concurred in the modification of the decree, but would go further and dismiss the bill.